Gen. 161]                                    161

GAMING − STATE LOTTERY − STADIUM AUTHORITY −
   STATUTORY CONSTRUCTION − SPORTS LOTTERIES NEED
   NOT BE INSTANT LOTTERIES


November 29, 1995


*Mr. Bruce Hoffman, P.E.*
*Executive Director*
*Maryland Stadium Authority*

You have requested our opinion whether the State Lottery Agency may conduct lotteries other than instant lotteries for the benefit of the Maryland Stadium Authority.

Although the question is a close one, our opinion is that the Lottery Agency may conduct any type of lottery for the benefit of the Stadium Authority, as long as the lottery game uses sports themes or involves sports-related promotions and otherwise complies with statutory restrictions on this type of lottery. The Agency is not limited by law to instant lotteries.


## I

### Background

The statute in question, §9-120.1 of the State Government ("SG") Article, Maryland Code, provides as follows:

> (a)  During each fiscal year the [Lottery] Agency shall conduct at least 2, but no more than 4 sports lotteries for the benefit of the Maryland Stadium Authority.

> (b)  In all advertising and on tickets, the Agency shall identify any lottery under this section as being conducted for the benefit of the Maryland Stadium Authority.

The issue is whether the legislative mandate for "sports lotteries" limited those lotteries to instant games.

Surely the text does not convey that limitation. The term "sports lottery" is not defined, but its straightforward meaning is a lottery using sports themes or sports motifs. A "lottery" is not limited to instant games. That general term embraces all of the offerings of the Lottery Agency. By regulation, the term "lottery games" encompasses both on-line and off-line games; the latter "includes but is not limited to instant rub-off tickets ...." COMAR 14.01.03.

If our analysis were limited to the text alone, we would quickly conclude that the text does not mandate instant lotteries only. A "text-only" approach would reflect a number of recent decisions by the Court of Appeals. *See Board of Trustees v. Hughes*, 340 Md. 1, 7-8, 664 A.2d 1250 (1995); *Cianos v. State,* 338 Md. 406, 411, 659 A.2d 291 (1995); *Park v. Board of Liquor License Comm'rs,* 338 Md. 366, 376, 658 A.2d 687 (1995); *Mayor and City Council v. Cassidy*, 338 Md. 88, 97, 656 A.2d 757 (1995); *Tidewater/Havre de Grace, Inc, v. Mayor and City Council*, 337 Md. 338, 347, 653 A.2d 468 (1995).

However, the Court has not abandoned its doctrine that the results of applying even the plainest language must be "consistent with the statute's apparent purpose." *Goldstein v. State*, 339 Md. 563, 568, 664 A.2d 375 (1995); *Rose v. Fox Pool Corp.*, 335 Md. 351, 359, 643 A.2d 906 (1994). In seeking to identify that underlying purpose, we may take into account the statute's legislative history. *See, e.g. , Rose v. Fox Pool Corp.*, 335 Md. at 360; *Kaczorowski v. City of Baltimore*, 309 Md. 505, 525 A.2d 628 (1987). The problem of interpreting SG §9-120.1 becomes much more complicated when we look at the legislative history.

SG §9-120.1 was enacted as part of Chapter 124 (Senate Bill 847) of the Laws of Maryland 1987. This bill dealt with the financing of the baseball and football stadiums at Camden Yards. Given the immense cost of these projects, not surprisingly the General Assembly thought long and hard about how to finance them. Thus, Senate Bill 847, the financing piece of the package of Stadium Authority Legislation, took some while to work out. *See generally Kelly v. Marylanders For Sports Sanity, Inc.* 310 Md. 437, 530 A.2d 245 (1987).

In February 1987, a study group led by the accounting firm of the Peat, Marwick, Mitchell & Co. submitted a report to the Stadium Authority that reviewed, among other things, alternative financing mechanisms. The study group recommended a "special sports lottery" as a revenue source for the Stadium Authority. In describing this special lottery, the study group referred to instant games: "Two $20 million instant games would probably fit within the present lottery product mix and not have a significant competitive impact on the existing lottery games. Therefore, this financing source should be considered in the financing plan." Phase II Report at 94.

A month latter, the Department of Fiscal Services submitted an influential report titled *The Stadium Issue*. In its discussion of financing sources for the Stadium Authority, the Department identified $16.4 million from "sports lotteries." *The Stadium Issue* at 16. The Department wrote that these "sports lotteries would be instant lotteries marketed with a sports orientation.... In order to realize $16.4 million in net proceeds the additional instant lotteries for the Stadium Authority's benefit would have to gross approximately $40 million." *Id*.[1]

This assumption — that the special sports lotteries would be instant lotteries — was reflected in the Revised Fiscal Note on Senate Bill 847. The fiscal note contained the following report about State revenues: "The Stadium Authority advises a $20 million instant sports lottery is anticipated at the beginning of the baseball season with a second such lottery at the beginning of the football season." A final reference to instant lotteries appears in a committee document called "SB 847 Issues." This issue paper states as follows: "Two instant sports lotteries will be conducted by the Maryland Lottery as a source of funding on an annual basis of $16 million of the debt service of the Maryland Stadium Authority for a 30 year period."

On the other hand, the legislative history is hardly uniform in treating "sports lottery" as if it were synonymous with "instant

---

[1] The legislative history of Senate Bill 847 also contains a copy of a financial consultant's analysis, prepared for the Stadium Authority, of "instant lottery revenues as a funding mechanism for the Maryland Stadium Authority." Memorandum from Stanley S. Fine to Herbert J. Belgrad (March 17, 1987).

lottery." The fiscal note, for example, in its discussion of "State fiscal impact," said that "the minimum of two $20 million sports lotteries should yield net revenues of $16,400,000 for the benefit of the Maryland Stadium Authority." Similarly, the Senate Finance Committee's "Overview of Senate Bill 847 as Amended" identified one revenue source as "sports lotteries − in order to yield $16.4 million in net proceeds, the lotteries will need to gross $40 million a year in revenues." Neither passage suggests that "sports lotteries" means instant lotteries only.

To summarize, there can be no doubt that those who looked at the financing of the stadiums assumed that the Lottery Agency would fund its annual contribution through a few instant lotteries. This assumption was understandable, because at the time instant lotteries were a novelty. They also lent themselves to varied designs and thus seemed a natural vehicle for financially productive sports lotteries.

But to say that the fiscal experts (and, inferentially, the General Assembly) assumed that instant lotteries would be the sports lotteries of choice is not to say that the General Assembly mandated that assumption into law. The General Assembly's primary purpose in requiring annual sports lotteries, after all, was to generate enough revenue for bond obligations to be met. This legislative purpose would be ill-served were we to engraft a particular marketing tool into the statute. The General Assembly might have avoided referring to instant lotteries in the statute itself out of a concern that a limited number of instant lotteries might well not retain sufficient market appeal over the 30 year life of the stadium bonds. *See Kindley v. Governor*, 289 Md. 620, 625, 426 A.2d 908 (1981) (broad statutory language may be construed to encompass "circumstances and situations which did not exist at the time of its enactment ...").

We must also consider a second presumed purpose of the General Assembly: to fashion lotteries that would fund the stadiums while still preserving, as fully as possible, the flow of lottery revenue into the General Fund. Indeed, the preamble to Senate Bill 847 identifies as a goal to "[m]inimize the use of State lottery and other revenues and the risk to the State's revenue base ...." To that end, the General Assembly directed the Stadium Authority to "[s]ubmit a report prepared in cooperation with the State Lottery Agency and the Department of Budget and Fiscal Planning on the effect of the lotteries conducted under §9-120.1 of the State

Government Article on the lottery revenues earned for the General Fund." §13-719(6) of the Financial Institutions ("FI") Article, Maryland Code.[2] One might suppose that limiting the sports lotteries to instant lotteries would further the purpose of protecting the rest of the Lottery Agency's endeavors.

But under the assumptions of the time, the General Assembly was told that a handful of instant lotteries would yield substantial revenues, enough to fund the stadiums. Attractive games of this type, as they were then, would have been perceived as posing the greatest risk of diverting gamblers from other lotteries, the revenues of which went to the General Fund. Mandating instant games would not have been thought a protection of the General Fund.

Rather, it seems to us, the General Assembly legislated a different protection against the siphoning of General Fund lottery revenues: It required lotteries for the support of the Stadium Authority to be sports lotteries and to be distinctly marketed as such.[3] This requirement was imposed to attract to these particular games a market segment, sports fans, that might not be as interested in playing the Lottery's regular games. While a sports motif may be easiest to design into instant games, imaginative marketers could surely contrive sports trappings or sports promotions for other types of lotteries as well.

---

[2] It is noteworthy that this report was not required to be submitted annually. *Cf.* FI §13-719(4), (5), (7), and (8) (requiring various annual reports).

[3] Another safeguard is that the lottery revenues are subject to annual appropriation. The budget bill provides a means by which the General Assembly can channel these revenues. For example, the current fiscal year's appropriation for the Stadium Authority contains a prerequisite to the crediting of $20 million to the Stadium Facilities Fund. Item 23.01.03.02. This prerequisite – a long-term lease with an NFL team – will have been satisfied when the agreement with the Browns becomes fully effective.

## II

## Conclusion

In summary, it is our opinion that the purposes underlying the General Assembly's financing mechanism for the stadiums can be served without importing into the text of the statute a requirement – that only instant lotteries fund the stadiums – that is nowhere to be found in the text. Thus, in our view, the Lottery Agency may conduct any type of lottery that it deems appropriate in support of the Stadium Authority, so long as the lottery has a sports motif or is otherwise clearly sports-related, does not exceed the statutory cap on the number of sports lotteries, and otherwise complies with SG §9-120.1.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*